UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


MELODY K. GAGLIARDO,                )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        No. 4:08 CV 411 DDN
                                    )
                                    )
 MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,    )
                                    )
            Defendant.              )


<u>MEMORANDUM</u>

        This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Melody K. Gagliardo for disability insurance
benefits under Title II and supplemental security income under Title XVI
of the Social Security Act, 42 U.S.C. § 401, <u>et seq</u>.  The parties have
consented to the exercise of plenary authority by the undersigned United
States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 7.)  For
the reasons set forth below, the court affirms the decision of the
defendant Commissioner.


<u>I.  BACKGROUND</u>

        Plaintiff Melody Gagliardo was born on February 11, 1963.  She is
5'10" tall with a weight that has ranged from 115 pounds to 171 pounds.
She completed high school with an emphasis in child care.  She last
worked at a window factory in her home area, but left after three weeks
because of neck strain.  Before that, she worked at Chrysler for 9
years, but stopped working there in May 2004.[1]  (Tr. 207, 241-43, 271.)

        On June 23, 2005, plaintiff applied for both disability insurance
and supplemental social security income benefits.  She alleged she

_____

        [1]Plaintiff was unsure whether she quit or got fired from Chrysler
when she stopped working there in May 2004.  (Tr. 243.)

became disabled on May 1, 2004 on account of damage to her spinal cord,[2] requiring spinal fusion of C5-6[3], herniated discs,[4] degenerative disc disease,[5] depression, and Attention Deficit Disorder (ADD).[6]  After a hearing on November 14, 2006, and a supplemental hearing on May 31,

---

[2]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

[3]Spinal fusion of C5-6 is a surgery that joins the selected bones in the neck. The bone is used to make a bridge between vertebrae that are next to each other, which stimulates the growth of new bone. WebMd, http://www.webmd.com/a-to-z-guides/cervical-spinal-fusion (last visited June 5, 2009).

[4]Herniated discs result from excessive pressure on a weakened disc, which causes some of the jellylike material in the center of the disc to squeeze through the tears in the capsule, causing the disc to rupture (herniate) into the space that surrounds a nerve root or the spinal canal.  A herniated disc can interfere with nerve function, leading to weakness, numbness, or pain in a leg or arm.  WebMD, http://www.webmd.com/hw-popup/herniated-disc-7991 (last visited June 5, 2009).

[5]Degenerative disk disease refers to the normal changes that occur in the spinal disks as a result of aging.  These changes can produce neck and back pain, as well as osteoarthritis, herniated disks, and spinal stenosis (the narrowing of the spinal canal).  WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview.  (Last visited June 5, 2009).

[6]Attention Deficit Disorder, now known as Attention Deficit Hyperactive Disorder, has three variations. The type described here is ADHD with inattentiveness.  A person with this disorder may have difficulty paying attention to details and a tendency to make careless mistakes, producing work that is often messy and careless; easily distracted by irrelevant stimuli; inability to sustain attention on tasks or activities; difficulty finishing schoolwork or paperwork or performing tasks that require concentration; procrastination; disorganized work habits, forgetfulness in daily activities; frequent shifts in conversation, not listening to others, and not following details or rules of activities in social situations.  WebMD, www.webmd.com (last visited on June 5, 2009).

2007, the Administrative Law Judge (ALJ) denied benefits on July 16, 2007. On February 12, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 12, 24, 53.)

## II. MEDICAL HISTORY

July 5, 2002 was the date of Gagliardo's first visits to Jay Liss, M.D. She went back every 3 months from 2002 until the present. (Tr. 192.)

On January 21, 2004, Gagliardo visited Richard Daughtrey, M.D., with complaints of sinus congestion/pressure and pain, along with purulent rhinorrhea[7] and sinus headaches twice a week, as well as follow-up on anxiety/depression, chronic neck pain, and hypothyroidism.[8] The patient had been experiencing intermittent neck pain and back spasms while on full duty at work, and used Soma[9] occasionally after work. She was also taking Lexapro,[10] Xanax,[11] and Synthroid[12] at the time. All her other ailments were under control with the various medications at the time. (Tr. 218.)

---

[7]Purulent rhinorrhea: runny nose consisting of thick pus. WebMD, http://www.webmd.com/allergies/tc/allergic-rhinitis-symptoms (last visited on June 9, 2009).

[8]Hypothyroidism is the diminished production of thyroid hormone, leading to thyroid insufficiency, which is characterized by a low metabolic rate, a tendency to gain weight, a strong desire for sleep, and sometimes myxedema, a skin disorder. Stedman's Medical Dictionary, 755, 1020.

[9]Soma is used to treat pain and discomfort from muscle injuries, such as sprains. WebMD, http://webmd.com/drugs (last visited June 5, 2009).

[10]Lexapro is an antidepressant used to treat depression and anxiety. WebMD, http://webmd.com/drugs (Last visited June 5, 2009).

[11]Xanax is used to treat anxiety and panic disorders. WebMD, http://webmd.com/drugs (Last visited June 5, 2009).

[12]Synthroid is used to treat an underactive thyroid (hypothyroidism). WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

On March 30, 2004, Gagliardo visited Dr. Daughtrey, for a follow-up on her hypothyroidism, anxiety/depression, as well as evaluation of cough with congestion, fatigue, night sweats, dizziness, nausea, and some mild lower abdominal pain with some difficulty with urination. She had been diagnosed with an infection by her urologist, and was prescribed Flagyl.[13] She described reoccurring intermittent lower abdominal discomfort over the bladder area. She also had experienced low-grade fevers, night sweats, laryngitis, drainage and nausea type symptoms, as well as some dizziness. She denied shortness of breath, and stated that her anxiety/depression were well controlled. She was taking Synthroid, Adderall,[14] Lexapro, Xanax, and Soma at the time. She was still smoking one pack of cigarettes, but reported efforts to try to cut back and was not consuming any alcohol. She reported a family history of thyroid cancer, and had a total thyroidectomy.[15] Dr. Daughtrey prescribed Z-Pak,[16] as well as albuterol MDI[17] to treat her bronchitis with reactive airway disease. (Tr. 214-15.)

--------

[13]Flagyl is used to treat a variety of infections. It belongs to a class of antibiotics known as nitroimidazoles. It works by stopping the
growth of bacteria and protozoa. WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

[14]Adderall is a combination medication used as part of a total treatment program to control attention deficit hyperactivity disorder (ADHD). It may help to increase the ability to pay attention, stay focused, and control behavior problems. WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

[15]A total thyroidectomy is an operation in which the entire gland (both lobes) and the lymph nodes surrounding the gland are removed. WebMd, http://www.webmd.com/a-to-z-guides/thyroid-surgery (Last visited June 9, 2009).

[16]Z-pak, more commonly known as Zithromax, or Azithromycin, is an antibiotic, used to treat very serious infections. WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

[17]Albuterol MDI is used to prevent and treat wheezing and shortness of breath caused by breathing problems, such as asthma or chronic obstructive pulmonary disease. WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

On May 17, 2004, Gagliardo visited Dr. Daughtrey, reporting neck and shoulder discomfort, which was exacerbated while working at her job at Chrysler pulling lug wrenches. She had been using Soma for the discomfort with minimal improvement. Dr. Daughtrey instructed Gagliardo to refrain from lifting greater than five pounds and not to do any repetitive bending/twisting/turning motions of the neck and shoulder areas. He continued her on Soma, and started her on Vioxx.[18] In addition, he noted she would be off work until her follow-up with Dan Riew, M.D., a spine surgeon, for an MRI on May 19, 2004. (Tr. 212.)

On June 8, 2004, Gagliardo visited Dr. Riew at Washington University Medical Center. She complained of neck pain, electrical shocks going down the back of her neck and pain down the left side several weeks prior; however, it had subsided since she had been off of work. After a physical examination, he found she had normal sensorimotor reflexes. An x-ray showed solid fusion, with a disc protrusion at C6-7 below where the previous cervical discectomy[19] and fusion at C5-6 were done. The problems from the protrusion had mostly subsided. The doctor instructed her to return to see him in two years, a total of five years after the surgery. (Tr. 231.)

On September 10, 2004, Gagliardo was seen at the Belle Family Health Center and evaluated by Dr. Daughtrey again. The notes indicate that she was there for a follow-up hospital evaluation secondary to sinusitis/bronchitis, as well as a follow up on hypothyroidism, anxiety/depression, gastroesophageal reflux disease (GERD), hiatal hernia,[20] and chronic neck pain. The ER had prescribed her

---

[18]Vioxx was used to treat arthritis pain, but is no longer prescribed. WebMD, http://webmd.com/drugs (Last visited June 9, 2009).

[19]Discectomy is the surgical removal of an intervertebral disk. M i r i a m - W e b s t e r ' s   O n l i n e   D i c t i o n a r y , http://medical.merriam-webster.com/medical/medical?book=Medical&va=di skectomy.

[20]GERD is a condition in which food or liquid travels backwards from the stomach to the esophagus (the tube from the mouth to the stomach.) This action can irritate the esophagus, causing heartburn, hiatal hernia, and other symptoms. Hiatal hernia is a condition in which part of the stomach moves above the diaphragm, which is the muscle
(continued...)

Doxycycline,[21] and she reported feeling much better at the date of this visit. At the time of her ER visit, her CBC[22] was within normal limits, and her BMP[23] revealed slightly low potassium of 3.5. She reported that all of her other past conditions were not a problem at that time, and that she had been off her medication for a few weeks since it had been stolen from her. She did have limited neck motion due to past cervical fusion, including decreased extension and lateral flexion, as well as lateral rotation. (Tr. 205-7.)

On August 18, 2005, Gagliardo was examined at the Moore Chiropractic Health Center by Dr. Joe Ray Moore. He diagnosed her with degenerative joint disease of the spine as a result of her spinal joint inflammation, moderate to severe pain, and restrictions in normal spinal joint mechanics. Dr. Moore noted that, when Ms. Gagliardo "is in full presentation of her disease, she is unable to dress herself, walk up or down stairs, and she is unable to perform all of her personal hygiene tasks without assistance." Furthermore, Dr. Moore stated that he did not believe Gagliardo capable of attaining or maintaining gainful employment in any capacity. (Tr. 235.)

On August 22, 2005, Gagliardo was examined at the University of Missouri Health Care Center by Osvaldo Acosta-Rodriguez, M.D. Her pain

---

[20](...continued) that separates the chest and abdominal cavities. WebMd, http://www.drugs.com/enc/gastroesophageal-reflux-disease.html (last visited on June 9, 2009).

[21]Doxycycline is used to treat many different bacterial infections, such as urinary tract infections, acne, gonorrhea, and chlymdia, peridontitis, and others. WedMd, http://www.drugs.com (Last visited June 9, 2009).

[22]CBC, or complete blood count, gives important information about the kinds and numbers of cell in the blood, especially red blood cells. WebMd, http://www.webmd.com/a-to-z-guides/complete-blood-count-cbc (last visited June 23, 2009).

[23]BMPs, or bone morphogenetic proteins, are messengers that appear naturally in the body, but are used to turn stem cells in the blood into bone cells where they are needed. They can be used in spinal fusion. WebMd, http://www.webmd.com/news/20011109/second-chance-summary-11-9-2001?page=2 (last visited June 23, 2009).

diagram indicated pain throughout all four limbs that was burning, and pain throughout her left upper shoulder, which was aching and extended throughout the base of her neck all the way to her shoulder. She had stabbing pain down her left forearm. She had aching and pins and needles throughout her left buttocks and left lateral thigh. She rated the intensity at a 5/10, but claimed it woke her up at night repeatedly, and she had difficulty falling asleep because of it. In addition, she complained it was made worse by sitting, standing, lifting, carrying, bending forward, vacuuming, sneezing, riding in a car, and brushing her teeth. (Tr. 237-38.)

After a physical examination, Dr. Acosta-Rodriguez found that her neck was supple, with no obvious JVD.[24] She had some mild facet tenderness throughout her entire cervical spine. She was able to move all four extremities quite well, and her grip strength was excellent bilaterally. She had a mild spread of reflexes, and down going toes with Babinski[25] and also negative Hoffman's sign.[26] She also had excessive motion of the left first thoracic rib. The head of the rib was tender to touch and she had a lot of muscle guarding and tenderness in this region. Further examination showed she had significant scapular protraction[27] bilaterally. However, the rest of her thoracic spine was

[24]Jugular venous pressure (JVP) is the indirectly observed pressure over the venous system. It can be useful in the differentiation of different forms of heart and lung disease. An elevated JVP is the classic sign of hypertension (e.g. right-sided heart failure), and can result in Jugular Venous distention (JVD), where the JVP is visualized at a level of the neck that is higher than normal. Wikipedia, http://en.wikipedia.org/wiki/Jugular_venous_pressure (Last visited June 9, 2009).

[25]Babinski's sign refers to extension of the great toe and abduction of the other toes instead of the normal flexion reflex to plantar stimulation. Stedman's Medical Dictionary, 1417.

[26] Hoffman's sign is the flexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked. Stedman's Medical Dictionary, 1420.

[27]Scapular protraction is the transverse plane motion of the shoulders away from the vertebral column which can result in excessive
(continued...)

healthy. She was able to sit in a sitting position for an extended period of time without complaint of increased back pain. (Tr. 237-8.)

Dr. Acosta-Rodriguez also did a fibromyalgia tender point count,[28] and found that she had a significant amount of tenderness along that distribution. He determined that she did not show signs of the alleged degenerative disk disease in the lumbar spine, nor did she show any signs of radiculopathy related to her herniated disc.[29] Consequently, his evaluation stated that she had the ability to perform work related functions such as sitting, standing, walking, and although she might have difficulties lifting due to her rib, she should have no difficulty handling objects, hearing, speaking, or traveling. (Tr. 237-39.)

On October 10, 2005, Gagliardo underwent a psychological evaluation by Dr. Joseph Long, Ph.D. Through a lengthy conversation related to Gagliardo's social, medical, and employment history, Dr. Long diagnosed her with Depressive Disorder, ADHD of mild severity, and Personality Disorder with avoidant and subtle paranoid features. He also noted at least mildly impaired ability to sustain concentration and persist with tasks. Her adaptive functioning was also at least moderately impaired. (Tr. 241.)

On October 19, 2005, Leslie Garvin, a Senior Counselor, performed a Physical Residual Functional Capacity Assessment of plaintiff. In that test, Garvin found that Gagliardo could occasionally lift 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour weekday; sit for about 6 hours total in an

---

[27](...continued)
strain  if  done  repeatedly.  BioMed  Central, http://www.biomedcentral.com/1471-2474/5/23 (last visited June 23, 2009).

[28]Fibromyalgia is a condition that causes fatigue, muscle pain, and "tender points." Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched. Fibromyalgia is also associated with difficulty sleeping, morning stiffness, headaches, and problems  with  thinking  and  memory.  Medline  Plus, http://www.nlm.nih.gov/medlineplus/fibromyalgia.html (last visited June 15, 2009).

[29]Radiculopathy is a disease of the spinal nerve roots. Stedman's Medical Dictionary, 1308.

8-hour workday; and perform unlimited amounts of pushing and/or pulling, with weight limitations.  Garvin noted a past history of spinal fusion and disc herniation in support of her conclusions, as well as her left 1st thoracic rib problem.  In addition, Gagliardo said she was careful not to "over do" her daily activities.  Additionally, Garvin found that plaintiff had a medically determinable impairment, and that her allegations were credible. (Tr. 124, 129.)

On October 26, 2005, Gagliardo visited Dr. Acosta-Rodriguez for a Family Services evaluation.  He affirmed she had somatic dysfunction of the thoracic spine, specifically in her left first rib.  Since her last visit, she had not done anything to correct it.  However, Dr. Acosta-Rodriguez found that she did not meet the criteria for medical relief. (Tr. 245.)

On November 1, 2005, Gagliardo underwent a psychiatric review by Dr. Paul Stuve, Ph.D., a licensed psychologist.  He noted her depressive disorder, as well as mild limitations in daily activities, maintaining social functioning, and maintaining concentration, persistence, or pace. He did not find her severely mentally impaired, and described her ability to partake in simple activities around her house and to maintain her finances.  (Tr. 110, 122.)

On February 27, 2006, Gagliardo saw Dr. Jay Liss, M.D., for a checkup.  A physical examination showed Gagliardo had neck fusion and a thyroid cancer gene.  After further examination, Liss diagnosed Gagliardo with depression, ADD, and dependency.  For treatment, Liss prescribed Ridderall,[30] Risperdal,[31] and Zoloft.[32]  He also noted she had poor concentration, poor memory and recall, and some confusion.  He noted that she was disabled, and that these symptoms had persisted for at least the last 3 years at these levels.  (Tr. 192.)

---

[30]Ridderall is used to treat ADD.  WebMd, http://www.drugs.com (Last visited June 15, 2009).

[31]Risperdal is an anti-psychotic drug used to treat mental and mood disorders like schizophrenia. WebMd, http://www.drugs.com (Last visited June 5, 2009).

[32]Zoloft is used to treat depression.  WebMd, http://www.drugs.com (Last visited June 5, 2009).

On July 18, 2006, Gagliardo visited Dr. Daughtrey for follow up on hypothyroidism, status post total thyroidectomy, secondary to a RET oncogene of the thyroid.[33]  He noted good control over her existing thyroid and depression problems, as well as her ADD. She was no longer having significant neck pain, although she did still have bulging discs. Also, she had persistent GERD/history of peptic ulcer disease[34]/ hiatal hernia, but appeared to be doing well, and did not need any new medication at the time.  While he did not prescribe any new medication, he recommended that she avoid heavy lifting, repetitive bending, and twisting, turning motions of the neck area.  (Tr. 252.)

On July 17, 2006, Gagliardo completed a Comprehensive Vocational Evaluation under Vocational Evaluator Melanie Burton of Job Point.  In her report, Burton noted her disabilities of C4-5 herniated disc with C5-6 fusion, Depression, and ADD.  The report also noted Gagliardo's vocational strengths, including: a high school diploma, strong family support, good academics, and motivation to improve motivational outlook. However, the report also noted barriers to employment for Gagliardo: her criminal record, her health problems, limited financial resources, and a lack of a driver's license.  The expert gave the following recommendations: Gagliardo needed to be able to change positions at will; avoid heavy lifting and carrying, and exposure to vibrations; and receive continued medical support to maintain optimal functioning.  In terms of employment, she would benefit from enhancement of her Mathematics Computations skill and would need formal training based on her academic training and aptitude.  (Tr. 271, 273.)

Although plaintiff Gagliardo participated in community based job shadows, and expressed interest in several potential fields, she was

---

[33]The RET (Rearranged during Transfection) is a gene, mutations of which are associated with various forms of thyroid cancer. Cancer Genetics Web, http://www.cancerindex.org/geneweb/RET.htm (last visited June 23, 2009).

[34]Peptic ulcers are crater like sores that develop when the digestive juices produced by the stomach eat away or erode the lining of the digestive tract. Peptic ulcers may form in the lining of the stomach or just below the stomach, at the start of the small intestine. WebMd, http://www.webmd.com/hw-popup/peptic-ulcers (Last visited June 15, 2009).

unable to keep her appointments with Job Point.  She finally met with a counselor and expressed interest in Social Service and working with people.  Burton further noted "when Melody is ready to seek employment, it is likely that she would benefit from placement assistance to locate, apply for, and obtain employment through Job Point's programs," and recommended that she seek employment within her limitations.  (Tr. 273.)

On February 22, 2007, Brenda Young, a certified vocational consultant, answered hypothetical interrogatories related to Gagliardo's file.  While she noted that Ms. Gagliardo could not return to her past work, there were jobs she could do, given the plaintiff's education, age, and work experience.  These jobs included sedentary work in assembly of small products, unskilled counter attendance, and other unskilled light work.  Young noted that those jobs were not consistent with the provisions of the Dictionary of Occupational Titles and the Selected Characteristics of Occupations.  The reason for the differentiation is that there are some positions in the labor market at the sedentary level, even though they might be listed as light work. (Tr. 108-9.)

**Testimony at the Hearing**

On November 14, 2006, Gagliardo testified at a hearing before the ALJ.  She last worked in May 2005 for about three weeks as a window assembler.  She had to stop this work as it caused too much neck pain. She also testified that she could lift things weighing up to 20 pounds, but not repeatedly.  In addition, Gagliardo testified that she had trouble paying attention to her job.  She also said that she saw her cousins a few times a week, but that she had emotional problems and worried about people liking her.  Her medication for her thyroid condition had been changed several times, and at times she was fatigued, but not as much now that she was no longer working at Chrysler.  She also testified that she did her own housework, and that she sometimes went on float trips.  She also testified that she was taking online computer classes using her parents' computer.  She reported not drinking any alcohol since Christmas.  (Tr. 393-413.)

On May 31, 2007, a vocational expert, Brenda Young testified at a supplemental hearing and answered several hypothetical interrogatories. The first question asked whether a claimant with Gagliardo's age, education, and work background, but with a GAF of 50 would be able to work. The expert stated that there were no jobs available in the national economy for such a person. The next hypothetical asked about a claimant who had to miss more than four days of work due to medical conditions, and the VE again testified that there were no jobs for such a person. The next hypothetical described a person with at least mild impairments in understanding and remembering instructions, a moderate impairment in the ability to sustain concentration and persist with tasks, and a moderate impairment with social and adaptive functioning. Gagliardo's attorney also defined "moderate" as seriously limited, but not precluded. The VE testified that with those limitations, Gagliardo would be able to do her previous work in assembly, but might seriously limit her ability to perform. In addition, she testified she could perform other unskilled types of positions. (Tr. 415-24.)

### III.  DECISION OF THE ALJ

The ALJ found Gagliardo, while having certain medical problems, had not been under a disability within the meaning of the Social Security Act at any time through the date of his decision. First, the ALJ found that plaintiff would meet the insured status requirements through June 30, 2010. However, he also found the preponderance of medical and other evidence to be inconsistent with the plaintiff's allegations of disability. (Tr. 12.)

The ALJ described the relevant medical history. Gagliardo has a history of cervical fusion surgery at C5-6 level of her spine and she has received ongoing treatment for hypothyroidism. She also had a total thyroidectomy, as well as a family history of thyroid cancer. (Tr. 15.)

Dr. Jay Liss, Gagliardo's treating psychiatrist from 2003 to 2006, produced a report in February 2006 listing her current conditions: attention deficit disorder (ADD), depression, and dependency. In addition, Liss had put her on Overture, Adderall, Risperdal, and Zoloft, when she could afford them. (Tr. 192.) Medical notes also indicated

the following symptoms: anhedonia,[35] appetite disturbance, decreased energy, blunt, flat or inappropriate affect, poverty of content of speech, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, substance dependence-in recovery, dysfunction of the brain with a specific organic factor, easy distractibility, memory impairment, and sleep impairment. In addition, plaintiff's GAF score was assessed at a level of 50. A GAF of 41-50 indicates a serious impairment in occupational functioning, usually an inability to get a job. This evidence leads to the conclusion that plaintiff has mental impairments that are severe enough to limit her ability to maintain concentration, persistence, and pace in completing work tasks. (Tr. 15.)

After nine years of employment at Chrysler, Gagliardo had to quit in 2004 because of the neck and shoulder discomfort she had while pulling "lug wrenches" at the assembly plant. Dr. Daughtrey examined Gagliardo and noted a decrease in range of motion and evidence of spine tenderness, but believed it was residual from past surgery rather than a new injury. He gave her samples of Vioxx for the pain, and instructed her not to lift more than 5 pounds. In addition, he diagnosed her with cervical/left shoulder strain. (Id.)

Later in 2004, an MRI of Gagliardo's cervical spine showed a central disc herniation at C4-5, with no abnormal cord signal; and a disc bulge at C6-7 without compromise of neural foramina or spinal canal. However, she reported only intermittent neck pain, and was not taking medication, and was averse to going back on medications. Also, her depression seemed under control and her blood levels relating to her thyroid condition were within normal limits. (Id.)

Although plaintiff was still unemployed, an examination in 2005 by Dr. Acosta-Rodriguez led him to be skeptical of her complaints regarding her medical condition. She appeared to be in no apparent distress, although she had some mild facet tenderness throughout her cervical spine. Her movement of all four extremities was very good, and her grip strength was "excellent." She had full range of motion in all joints

---

[35]Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable. Stedman's Medical Dictionary, 85.

except for slight decrease in ability to rotate the cervical spine. He did not find evidence of muscle atrophy,[36] spasms, or muscle tenderness except for the first thoracic rib[37] on the left. While Dr. Acosta-Rodriguez noted her history, he concluded that her ability to perform in a work environment should not be affected adversely. She should have no trouble walking, sitting, standing, handling objects, hearing, speaking, or traveling. He noted that she might have trouble carrying things using her left side. (Tr. 16.)

In October 2005, Gagliardo underwent a consultative psychological evaluation, which showed a low to average intellect and a history of psychiatric help. However, plaintiff had since stopped taking her psychiatric medication in the last year. Her activities at the time included walking in the woods, reading books, picking on her guitar, watching television, and doing basic household chores. She also visited relatives and expressed obvious pleasure in being able to care for her first grandchild. She was diagnosed with depressive disorder, not otherwise specified; ADHD of mild severity; and personality disorder with avoidant and subtle paranoid features. She also seemed to be at least moderately impaired in her ability to sustain concentration and persistence in completing tasks and in social and adaptive functioning. (Id.)

After a Family Services evaluation in 2005, Dr. Acosta-Rodriguez opined that he did not believe that Gagliardo qualified for "medical relief." Test results done in 2006 showed only a history of hypothyroidism. Some recent weight gain, frequent fatigue, and occasional dizziness supported this diagnosis. Although Gagliardo received assistance in finding a new career in early 2006, she became uncooperative in returning phone calls and attending meetings after a few months. A report in July, 2006, showed test scores that recommended her for post secondary training, but she had difficulty deciding what

---

[36]Muscle atrophy is the wasting and weakness of muscles due to non-use. WebMd, www.webmd.com (last visited June 15, 2009).

[37]First thoracic rib is the vertebra where the top rib attaches to the spine.

she wanted to do.  Also, lack of transportation, due to her two DWI's, limited her ability to get to work.  (Tr. 17.)

Plaintiff did not seek medical help from January through July of 2006.  Gagliardo returned to see Dr. Daughtrey in July, at which time he found that her thyroid was in good control with the help of her current dosage of Synthroid, her depression in check with Nortriptyline. In addition, her ADD was well-controlled by her prescription of Adderall.  While she had no significant neck pain or tenderness, Dr. Daughtrey again recommended that she avoid heavy lifting, repetitive bending, and twisting/turning motions of the neck area.  Dr. Daughtrey had similar findings in September of 2006.  A vocational rehabilitation report from November 6, 2006, indicated that plaintiff intended to apply for admission to Columbia College for a degree in Criminal Justice Administration. (Tr. 17.)

The ALJ found that plaintiff's degenerative disc disease did not meet the severity requirements in Listing 1.04.  Although plaintiff had a central disc herniation at C4-5 and a bulging disc at C6-7, Dr. Daughtrey stated in his report that there was not a risk of further injury to the spinal cord.  In addition, Gagliardo seemed to maintain the use of all four extremities, grip strength, and full range of motion in all joints except for decrease in motion of the cervical spine.  Dr. Acosta-Rodriguez found there was no evidence of significant sensory, motor, or reflex abnormalities.  Although plaintiff had evidence of tenderness around the first thoracic rib on the left, Dr. Acosta-Rodriguez also found no appearance of muscle atrophy, spasms, or tenderness elsewhere. (Tr. 18.)

The ALJ also discounted plaintiff's complaints related to her thyroid disorder.  He did not find any evidence supporting her contention that  her body systems were significantly affected by the disorder.  In fact, the ALJ found that medical reports indicated symptoms were well controlled with medication. From reports in 2004 and 2006, complications seemed limited, failing to satisfy the disability requirements under the definitions of the Social Security Act.  (Id.)

The ALJ also did not find plaintiff to be disabled in relation to her depressive disorder.  To meet the requirements for depression-

related disability, evidence must show an affective disorder characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Both parts of the two-part test must be satisfied. The ALJ found evidence supported the first prong of the test, an existence of persistent depressive syndrome. (Id.)

To satisfy the requirements for the second part of the test, a claimant must demonstrate symptoms sufficient to meet Part B or Part C of the Listing. Part B requires limitations of a claimant's ability to function in society. A claimant's limitations must be so severe that they result in at least two of the following: 1. Marked restriction of activities of daily living; 2. Marked difficulties in maintaining social functioning; 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or 4. Repeated episodes of deterioration or decompensation in work or work-like settings, which cause the individual to withdraw from that situation or to exacerbate signs and symptoms. (Tr. 19.)

Dr. Liss's evaluation done in February 2006 showed that plaintiff suffered from anhedonia; appetite disturbance; decreased energy; and difficulty thinking or concentrating. However, the ALJ discounted Dr. Liss's conclusion related to the second part of the test. While Dr. Liss indicated that she would be unable to meet competitive standards in all areas of work-related mental functioning, the ALJ found the other evidence in the same report was inconsistent with this premise. Dr. Liss's support for such a finding was plaintiff's poor memory, poor "persistence of pace," and cognitive dysfunction. However, Dr. Liss's report also stated that Gagliardo could manage her own basic finances and that she did not have a low IQ or limited mental capacity. The ALJ noted that the uncontradicted opinion of the treating physician is entitled to substantial weight. However, there must be medically accepted data to support the diagnosis. (Id.)

Based on vocational rehabilitation services' report, plaintiff qualified for a program involving additional college-level education. Furthermore, Dr. Liss's progress notes described the patient as "doing well" on her current medications. Dr. Long also evaluated Gagliardo and

determined her mental limitations were less severe than indicated by Dr. Liss's report. Dr. Long concluded that her ability to understand and remember instructions was at least mildly impaired. Also, her ability to sustain concentration and persistence in completing tasks was moderately impaired, as was her social and adaptive functioning. However, both Dr. Liss and Dr. Long noted that she was capable of managing her own basic finances. (<u>Id.</u>)

Even if a claimant did not satisfy the requirements in Part B, if she satisfied the requirements for Part C, she would meet the definition of disabled. Part C requires that, because of the impairment, the individual must completely lack the ability to function independently outside one's home. However, the ALJ found that plaintiff's activities indicated she had the ability to function outside the home. Her frequent visits with family members, attendance at medical appointments, and other similar daily activities demonstrated her ability to do things outside of her own home, according to the ALJ. She lived by herself and was able to conduct activities of daily living. She interacted regularly with relatives and others, and denied having difficulty getting along with people. She shopped for her own groceries, and could use a checkbook, and had no evidence of decompensation or deterioration. Therefore, the ALJ found that she does not qualify under the second part of the test (Tr. 19, 20.)

After reviewing the record, the ALJ next found Gagliardo retained the residual functional capacity (RFC) to lift 20 pounds occasionally, but could not lift frequently. She would need to avoid repetitive bending, twisting, and turning of her neck, and would be limited to performing jobs that require basic simple instructions and directions only. The ALJ found that plaintiff could not return to her previous employment. However, the ALJ found that there were jobs in the national economy that plaintiff could perform. (Tr. 20-22.)

The ALJ then fund that plaintiff Gagliardo was 41 years of age of the alleged date of disability (a younger individual under the regulations), that she had at least a high school education and could communicate in English, and that there were jobs in the national economy that plaintiff could perform. (Tr. 22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return

to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Gagliardo could not perform her past work, but that she maintained the RFC to perform other work in the national economy.

## V.  DISCUSSION

Gagliardo argues the ALJ's decision is not supported by substantial evidence.  First, Gagliardo argues that the testimony of the vocational expert is not consistent with the Dictionary of Occupational Titles. (Doc. 14 at 4.)  Second, Gagliardo argues the ALJ failed to properly weigh medical opinion evidence.  (Id. at 8.)

**Testimony of the Vocational Expert**

Gagliardo argues that the testimony of the vocational expert is not consistent with the Dictionary of Occupational Titles (DOT).  In evaluating a claimant's work capacity, the ALJ must first evaluate whether a claimant could perform her past work.  If she is unable to do so, the ALJ skips to Step 5 and evaluates the claimant's ability to do any other jobs that exist in the national economy.  20 C.F.R. § 404.1520.  In Step 5, the defendant has the burden to demonstrate that jobs exist in significant numbers in the national economy that the claimant is capable of doing.  Id.

The DOT, published by the Department of Labor, provides standardized occupational information to support job placement activities in the national economy.  Montgomery v. Chater, 69 F.3d 273, 274 (8th Cir. 1995).  The Social Security Administration also has a job classification system for all forms of employment in the national economy.  20 C.F.R. § 404.1527.  In order to determine the physical exertion requirements of work, the Social Security Administration classifies jobs as sedentary, light, medium, heavy, and very heavy.  Id. These terms have the same meaning as they do in the DOT.  Id. The terms' definitions include physical capacity requirements, reasoning level, math level, reading level, and writing level.  Id.  If the Commissioner determines a claimant does not have the capacity to perform past jobs,

he may rely on a vocational expert's testimony to show that the claimant can perform other work with his or her existing symptoms.  Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008).  The ALJ shall pose hypothetical questions for the vocational expert describing plaintiff's symptoms.  Id.  The questions do not have to include all of the plaintiff's alleged impairments, just "those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

The VE, after considering the physical and mental capacity of the plaintiff, must determine whether jobs exist in the national economy that someone with plaintiff's symptoms could perform.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).  The VE's determination should be consistent with the definitions provided in the DOT.  Id. at 1070. However, if there are any discrepancies, the VE may rebut the DOT classification with a reasonable explanation for that discrepancy.  Id. That explanation should show that particular jobs, whether classified "as light or sedentary, may be ones that a claimant can perform." Id. (citing Montgomery, 69 F.3d at 276).

Because of her physical illnesses, plaintiff is unable to perform her past work, so the ALJ moved to Step 5 of the 5-step test to determine disability.  (Tr. 11.)  In this case, the ALJ's hypothetical question had the VE assume that the plaintiff could occasionally lift up to twenty pounds, but not do any frequent lifting; should avoid repetitive bending, and the twisting/turning motion of the neck.  (Tr. 67.)  Also, plaintiff would be limited to performing jobs that require simple instructions and directions only.  Although plaintiff could not return to her previous work, the ALJ's expert testified that there were jobs that exist in large numbers in the national economy that she could perform, such as a small parts assembler, counter attendant, or janitor. (Tr. 23.)

Plaintiff argues that the vocational expert's recommendations were inconsistent with the definitions in the DOT.  (Doc. 14 at 4.)  Each of the jobs the VE recommended required a GED (General Educational Development) level of at least R2.  (Doc. 14 at 5.)  A level of R2 requires the ability to carry out detailed but uninvolved written or

oral instructions. DOT, Vol. II at 1011, vol. 1 at 281. A level of R1 requires an ability to carry out simple one-or two-step instructions. Id. Plaintiff argues her capacity is at a R1 reasoning level. (Doc. 14 at 5.) However, the hypothetical questions given to the vocational expert only specify someone limited to "jobs involving understanding, remembering and following simple instructions and directions," not to someone with a capacity of R1. (Tr. 67.)

The ALJ granted the request for a supplemental hearing to give additional interrogatories to the vocational expert. Those interrogatories asked whether a claimant, "with a moderately impaired ability to sustain concentration and persist with tasks, and at least moderate impairment in social and adaptive functioning, could perform past work or other work." (Tr. 23-4.) Again, those interrogatories did not specify a reasoning level of R1. The VE did testify that the jobs she claimed Gagliardo could perform were classified as "light" in the DOT, which was inconsistent with Gagliardo's capabilities.

However, she also provided an explanation for the discrepancy in her diagnosis. She explained that many of those positions existed at the sedentary level in the labor market, although they were technically classified as light. (Tr. 67.) Regardless of the classification, if jobs exist that plaintiff can perform at the sedentary level, the ALJ may rely on VE's testimony to show she is not disabled. Robson, 526 F.3d at 392.

**Weighing Medical Testimony**

Gagliardo argues the ALJ failed to properly weigh the medical opinions. (Doc. 14 at 8.) In particular, Gagliardo argues that the ALJ erred by disregarding Dr. Daughtrey's notes on her physical limitations. She also argues that the ALJ erred by using an RFC produced by Leslie Garvin, who is not a medical consultant, only a lay person who develops evidence for DDS. Furthermore, Gagliardo argues that the ALJ did not give the opinions of the treating physicians, Dr. Liss and Dr. Daughtrey, the appropriate controlling weight. Finally, she argues that the ALJ must admit evidence from a relevant third party. (Tr. 9, 13, 15.)

The ALJ should afford a treating physician substantial weight in making a determination of disability. <u>Casey v. Astrue</u>, 503 F.3d 687, 691 (8th Cir. 2007). However, where a patient self-testifies to her lifting capacity, the ALJ should credit a patient's testimony over the doctor's. <u>Gallus v. Callahan</u>, 117 F.3d 1061, 1064 (8th Cir. 1997); <u>Johnson v. Chater</u>, 108 F.3d 942, 945 (8th Cir. 2007) (finding that, "although Johnson's residual functional capacity assessment indicated that Johnson could only lift or carry up to ten pounds on an occasional basis, Johnson in fact had the capacity to lift up to fifteen to twenty pounds, based on Johnson's own admissions at the administrative hearing.")

Plaintiff Gagliardo testified at the hearing before the ALJ that she could do some but not repetitive lifting. She said she could lift her grandson, who she testified then weighed "about 20 pounds." (Tr. 403.) Thus, the ALJ's finding that she could occasionally lift 20 pounds is supported by the plaintiff's own testimony during the hearing.

Gagliardo argues that the ALJ disregarded Dr. Daughtrey's notes on patient limitations from 2004, and again in 2006, stating that she should avoid heavy lifting of more than five pounds. (Tr. 15.) According to that recommendation, plaintiff would be unable to lift anything more than five pounds and would be incapable of even completing sedentary exertional work; therefore, she would qualify for disability under the Act. 20 C.F.R. § 404.1567. However, the ALJ determined that plaintiff has the residual capacity to lift 20 pounds occasionally, but no frequent lifting. If Gagliardo can lift 15-20 pounds, she is capable of doing light work. Anyone who is capable of light work is not considered to be disabled. Although Dr. Daughtrey recommended a limitation of not lifting more than 5 pounds, Gagliardo herself testified that she could occasionally lift 20 pounds. (Tr. 15, 20.) Her testimony entitles the ALJ to consider her ability at 15-20 pounds. <u>Johnson</u>, 108 F.3d at 945.

Second, plaintiff argues that the ALJ improperly considered the RFC produced by Leslie Garvin, since Garvin is not a medical consultant, but only a lay person who develops evidence for DDS. (Doc. 14 at 9.)

The RFC or Residual Functional Capacity test is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey, 503 F.3d at 696. The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 69; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff does not raise any issues with the ALJ's process before Step 5. Since the ALJ did properly consider Gagliardo's case from Steps 1 through 4, we need only to evaluate his process at Step 5. In order to determine whether she is fit for new work, he must consider the objective evidence, her subjective complaints of pain, and the Polaski factors. He does not need to mention each Polaski factor individually, just note that he did, in fact, consider them generally. Guilliams v. Barnhart, 393 F. 3d 798, 802 (8th Cir. 2005).

In determining claimant's ability to perform other work, the ALJ must first consider the credibility of the claimant in order to properly evaluate her subjective complaints. McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995). He can discount her complaints only if they are inconsistent with the record as a whole, but may not do so solely based on minor inconsistencies in the record. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003). The ALJ must state the reasoning for discrediting claimant's subjective complaints. Guilliams, 393 F.3d at 802; Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2007). Along with consideration of subjective complaints, the ALJ must consider the Polaski factors. Included in those factors is a consideration of claimant's history of medication. Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984.) Generally, pain which can be remedied or controlled with over the counter analgesics, normally will not support a finding of disability.

<u>Loving v. Dept. of Health and Human Servs.,</u> 16 F.3d 967, 971 (8th Cir. 1994).  Furthermore, a refusal to take pain medication can discredit a claimant's subjective complaints.  <u>Singh v. Apfel</u>, 222 F.3d 448, 454 (8th Cir. 2000).

On the initial grounds of credibility, the ALJ found Gagliardo's allegations of pain and injury to be only partially convincing.  While the evidence of record indicates a history of spinal fusion, hypothyroidism, and periods of depression, it does not indicate persistent problems with each of these.  Instead, her description of the duration, intensity, and limiting effects of the symptoms seem inconsistent with the record.  Although she complained of pain, clinical evidence did not show a level of severity that would impede ability to work.  Gagliardo alleged that her pain is so severe that she was unable to work, yet she was able to care for her personal hygiene, do daily housework, babysit her grandchild, and manage her finances—all without assistance.  In addition, throughout the record, she reported only intermittent pain, and that she was not taking medication at the time.  Her limited amount of pain, even without medication, demonstrates an ability to work without too much residual pain.  (Tr. 21, 239, 243, 252.)

As the ALJ noted, plaintiff declined to take pain medication at certain times throughout the past several years, and hoped to avoid taking anymore in the future.  Her refusal to take medications, especially with conditions that have been well controlled by medication in the past, discredits her subjective complaints.  <u>Singh</u>, 222 F.3d at 454; <u>Loving</u>, 16 F.3d at 971.  In addition, Dr. Daughtrey, her primary care physician, noted her history of problems in the past, but also noted she was doing well in 2006.  (Tr. 252.)  The ALJ properly considered Gagliardo's medical history in detail, her daily activities, as well as her allegations of the duration, frequency, and intensity of her pain.  His RFC determination was not based on a report from L.M. Garvin, as plaintiff argues, but on a proper and complete evaluation of all of the relevant evidence.  In fact, the ALJ does not even mention the RFC from Garvin in his decision.  Therefore, the ALJ's consideration of each of these factors supports his determination that plaintiff's

allegations were not entirely credible, and that she is capable of doing other jobs which exist in the national economy.

Gagliardo also argues that the ALJ failed to give substantial weight to the opinions of the treating physicians, Dr. Liss and Dr. Daughtrey.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. <u>Pearsall</u>, 274 F.3d at 1219. The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. <u>Id.</u> Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey</u>, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by more or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. <u>Guilliams</u>, 393 F.3d at 803; <u>Cantrell</u>, 231 F.3d at 1107. In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. <u>Casey</u>, 503 F.3d at 692.

The ALJ discounted the opinion of Dr. Liss as inconsistent internally. (Tr. 19.) In February 2006, Dr. Liss indicated that plaintiff would be unable to meet competitive standards in the workplace, due to her poor memory, poor "persistence of pace," and cognitive dysfunction. However, he also testified that she could manage her own bank account and did not have a reduced intellectual capacity. (Tr. 194.) These two findings are inconsistent, and the ALJ did not err in discounting Dr. Liss's opinion.

A treating physician is entitled to substantial weight, but is not conclusive. <u>Singh</u>, 222 F.3d at 448. It must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in record." <u>Id.</u> Gagliardo's ability to manage her own finances indicated a higher level of reasoning and understanding, sufficient to allow her to engage in some kind of work. An ability to perform chores and certain other activities indicates an ability to engage in gainful activity. <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1347 (8th Cir. 1993). Furthermore, Dr.

Liss's progress notes do not indicate a mental instability, as he even states she is "doing well" in September 2006.

The ALJ properly discusses plaintiff's entire medical record, including the records from Dr. Daughtrey. At an outpatient visit in 2004, the record indicates only intermittent pain, good control of her depression, normal limits of her thyroid condition, adequate energy, and no additional risk from her bulging discs. Again in 2006, Daughtrey noted good control of her conditions with medication, and that she appeared to be doing well overall. Although he continued to recommend an avoidance of heavy lifting, he also noted she was getting help in retraining for a different profession. Dr. Liss confirmed Dr. Daughtrey's prognosis later in 2006 that plaintiff was "doing well" on her medications. (Tr. 17-18.) Because the ALJ properly considered her treating physicians' entire medical reports, as well as the consulting physicians, he did not err in his determination that her conditions were not severe enough to limit her ability to participate in gainful activity.

Lastly, plaintiff argues that the ALJ must admit evidence from a relevant third party, the interviewer for DDS. (Doc. 14 at 15.) Plaintiff argues that the ALJ should have considered the interviewer's report that her "memory was very sketchy, she had difficulty with dates for work and doctors." However, the interrogatories given to the vocational expert included the stipulation that plaintiff could only remember simple details and instructions. Furthermore, the ALJ considered all of the medical records in his determination of her RFC, which would have included any reports of memory limitations. (Tr. 23-24.) Although there is a distinction in what the adjudicator must consider and what he must explain in his decision, he generally should indicate the weight given to opinions from non-medical sources, if those opinions will have a significant effect on the outcome of the case. SSR 06-3p. However, since the medical reports already included her limitations in memory, he did not need to detail his consideration of this third party.

After reviewing the record, substantial medical evidence supports the ALJ's determination that plaintiff is not disabled.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 20, 2009.